CRAIG WEINER, ESQ.
New York Bar No. 2468239
(*pro hac vice* to be submitted)
RICHARD MESCON, ESQ.
New York Bar No. 1434968
(*pro hac vice* to be submitted)
SHERLI FURST, ESQ.
New York Bar No. 4783577
(*pro hac vice* to be submitted)
ROBINS KAPLAN LLP
601 Lexington Avenue, Suite 3400
New York, New York 10022-4611
Telephone:  (212) 980-7400
Facsimile:  (212) 980-7499
Email: CWeiner@RobinsKaplan.com
           RMescon@RobinsKaplan.com
           SFurst@RobinsKaplan.com

JAMES PATRICK SHEA, ESQ.
Nevada Bar No. 405
SCOTT D. FLEMING, ESQ.
Nevada Bar No. 5638
ARMSTRONG TEASDALE LLP
3770 Howard Hughes Parkway, Suite 200
Las Vegas, Nevada 89169
Telephone:  702.678.5070
Facsimile:  702.878.9995
Email: jshea@armstrongteasdale.com
           sfleming@armstrongteasdale.com

*Counsel for Plaintiff, Sonoro Invest S.A.*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| SONORO INVEST S.A., a Panamanian corporation,<br><br>Plaintiff,<br><br>vs.<br><br>ROBERT MILLER, an individual; ANDREW SHERMAN, an individual; COSTAS TAKKAS, an individual; and STEPHEN GOSS, an individual,<br><br>Defendants<br><br>and<br><br>ABAKAN, INC., a Nevada corporation,<br><br>Nominal Defendant. | Case No. 2:15-cv-00286<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1

Plaintiff, Sonoro Invest S.A. ("Sonoro"), by and through undersigned counsel, hereby files this Complaint against Defendants Abakan, Inc. ("Abakan" or the "Company"), Robert Miller, Andrew Sherman, Costas Takkas, and Stephen Goss (Miller, Sherman, Takkas, and Goss, are hereinafter, collectively, the "Individual Defendants"), and alleges as follows:

## NATURE OF THE ACTION

1. This action ("Action") arises from violations of fiduciary duties, gross mismanagement, self-dealing, fraudulent transfer and other business torts committed by Abakan's officers and directors. Sonoro, a longstanding shareholder of Abakan, seeks to assert allegations of improper management against Abakan's officers and directors, who have damaged the Company by upstreaming value to related entities without adequate compensation to Abakan. Federal jurisdiction over this Action is based upon diversity of citizenship.

2. The egregious behavior of Abakan's officers and directors, and other subsequent events since the issuance of Sonoro's Demand to Abakan's Officers and Directors ("Demand") has left Sonoro with no other option but to bring this suit. Individual Defendants have breached their obligations and shirked their responsibilities, in violation of court ordered injunctions and in contempt of judgments. They have also failed to make any reasonable effort at addressing Sonoro's concerns and redressing their wrongs. On August 14, 2015, Abakan was held in civil contempt by Judge Denise Cote of the United States District Court for the Southern District of New York for violating the terms of a preliminary injunction with respect to the conduct of its business, and on September 24, 2015, Judge Cote appointed a Receiver over Abakan. A copy of the order appointing a Receiver (the "September 24 Order") is attached as Exhibit A to the Complaint.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this Action pursuant to 28 U.S.C. § 1332, in that there is diversity of citizenship between Sonoro, Abakan, and the Individual Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(d) in that Abakan is incorporated in the State of Nevada and maintains contacts in the District of Nevada-Las Vegas that would subject it to personal jurisdiction.

2

**THE PARTIES**

5.      Sonoro is a Panamanian corporation with its address at Calle 53E Urbanizacion Marbella, MMG Tower, 16th Floor, Panama, Republic of Panama.  Plaintiff was a shareholder of Abakan at the time of all the transactions complained of in this Complaint.  This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

6.      Upon information and belief, Abakan is a Nevada corporation which, at all times relevant to this Action, had its principal place of business at 2665 South Bayshore Drive, Suite 450, Miami, Florida 33133.  Pursuant to the September 24 Order, Robert Seiden was appointed Receiver of the Company.  Mr. Seiden has maintained Abakan's offices in New York since his appointment.[1] On November 15, 2015, involuntary bankruptcy petitions were filed against both Abakan and MesoCoat in the United States Bankruptcy Court of the Southern District of Florida.

7.      Upon information and belief, at all times relevant to the Complaint, Robert Miller was the Chief Executive Officer (CEO) and a member of the Board of Directors of Abakan ("Abakan's Board"); he was also the Chief Operating Officer (COO) of MesoCoat and a director of Powdermet Inc. ("Powdermet").  Miller resides in Coral Gables, Florida.

8.      Upon information and belief, Andrew Sherman served as CEO of MesoCoat from 1996 to July 27, 2015, when he was replaced by Stephen Goss.  Sherman served as CEO of Powdermet from 2007 until May 31, 2014, and was a member of Abakan's Board at all times relevant to the Complaint.  Sherman resides in Mentor, Ohio.

9.      Upon information and belief, Costas Takkas served as the Chief Financial Officer (CFO) of Abakan, from February 7, 2014 through May 29, 2015, and was a member of Abakan's Board.  Takkas resigned from his positions upon his arrest in the FIFA soccer scandal.  Takkas resides in Miami Beach, Florida.

10.      Upon information and belief, Stephen Goss was the CEO of MesoCoat from June 2014 until approximately September 2015, and at all times relevant to the Complaint, was a director and COO of Abakan.  Goss resides in Moore, South Carolina.

---

[1] Abakan is a holding company with limited operations, and MesoCoat Inc. ("MesoCoat") is its operating subsidiary.

11.     Upon information and belief, each of the Individual Defendants personally profited in the wrongful actions alleged herein.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

12.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Abakan the fiduciary obligations of good faith, trust, loyalty, and due care, and were, required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of the Company so as to benefit the Company and not in furtherance of their personal interests or benefit.

13.     Individual Defendants owed Abakan the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligation of fair dealing.  The Individual Defendants, because of their positions of control and authority as directors and/or officers of Abakan, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

14.     Each Individual Defendant, by virtue of his position as a director and/or officer, owed to the Company the fiduciary duties of loyalty, good faith, candor, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.

15.     The Individual Defendants breached their duties of loyalty, candor, due care and good faith by allowing each other to cause, or by themselves causing, the Company to misrepresent its financial details and prospects, and engage in transactions for their personal benefit, as detailed herein, and by failing to prevent one another from taking such illegal actions.

. . .

. . .

. . .

4

**DEMAND**

16.     On June 25, 2015, Sonoro demanded that the Board of Directors of Abakan  conduct an internal investigation and commence a civil action with respect to the claims set forth herein, and that the Board hold the required and long-delayed annual meeting of shareholders. Thereafter, Individual Defendants took no substantive action to investigate Sonoro's allegations. *See* Demand attached as Exhibit B to the Complaint.

17.     While Abakan's Board initiated an inquiry into Sonoro's claims, this so called "investigation" was short-lived and almost immediately abandoned.  In fact, Individual Defendants did not even hold the required annual stockholder's meeting or a special meeting so that directors could be duly elected.

18.     On September 24, 2015, Judge Cote found that Abakan had violated the terms of the preliminary injunction she had ordered and appointed Robert Seiden as the Receiver for Abakan.

19.     Sonoro has been advised that the Receiver reviewed the Demand served prior to his appointment, but has confirmed that Abakan would be unable to pursue the claims asserted herein because it lacks the financial resources to do so.

20.     On November 15, 2015, as a direct result of Individual Defendants' wrongful conduct, involuntary bankruptcy petitions were filed against Abakan and MesoCoat in the United States Bankruptcy Court for the Southern District of Florida.  On November 18, 2015, Judge A. Jay Cristol ruled that there was no automatic stay in place because of the bankruptcy, and in the alternative, ordered the lifting of any such stay (Case Nos. 15-26606 & 15-29607).  A copy of Judge Cristol's Order is attached as Exhibit C.

21.     In light of these facts, further demand on Abakan to assert the claims set forth herein would be futile.

22.     Accordingly, Sonoro brings this action on behalf of the Company to seek appropriate damages.

**BACKGROUND FACTS**

23.     According to Abakan's public disclosures, Abakan, through its subsidiary MesoCoat and MesoCoat's affiliate Powdermet, designs, develops, and markets advanced nano-composite

materials, innovative fabricated metal products, highly engineered metal composites, and engineered reactive materials for applications in the oil and gas, petrochemical, mining, aerospace and defense, energy, infrastructure, and processing industries. Abakan's technology portfolio included high-speed, large-area metal cladding technology, long-life nano-composite anti-corrosion and wear-coating materials, and high-strength, lightweight metal composites.

24. Abakan's operations are, and were, conducted through its related subsidiaries, MesoCoat and Powdermet. Initially, MesoCoat was owned 100% by Powdermet. Powdermet was in turn owned 52% by Sherman, 41% by Kennametal, Inc. (an unrelated company), and 7% by other unrelated parties. In 2009, Abakan purchased 79,334 shares of MesoCoat and acquired a fully diluted 34% interest in MesoCoat for $1,400,030. Thereafter, on March 21, 2011, the Company purchased 596,813 shares of Powdermet from Kennametal, Inc. equal to a 41% interest in Powdermet. On July 13, 2011, the Company obtained a fully diluted 18.5% equity interest in Powdermet for $2,800,000, thereby increasing its direct ownership of MesoCoat to a fully diluted 52.5% interest.

25. From 2011 through 2013, Abakan seemed to be financially viable as a company. Abakan's shares reached a high of $3.38 on May 6, 2013. However, due to gross mismanagement, corporate waste, self-dealing, and other violations of duties to Abakan, that price was not long maintained. Indeed, by the following January, Abakan's stock was trading at only $1.25 per share. Currently, the share price is approximately $0.05 per share.

26. As Abakan's business deteriorated, Abakan's directors and officers diverted funds from legitimate and well-advised business applications to themselves and to related parties. As discussed below, they also failed to investigate or exercise due care and proper business judgment with respect to agreements entered into by Abakan and other obligations that it incurred.

**A. Individual Defendants Failed to Ensure that Abakan Received Adequate Consideration for an Investment in its Subsidiary MesoCoat**

27. When Abakan's financial situation started to deteriorate in 2014, Individual Defendants began to reposition or otherwise misapply funds to related entities that would otherwise have been dedicated to its business operations. On or about May 31, 2014, Abakan increased its

ownership position in MesoCoat. Abakan converted an additional $6,200,000 of its investment in MesoCoat to equity. It also gave 310,000 Powdermet shares and 2,000,000 of Abakan restricted stock common shares to Powdermet. In exchange, it received 98,000 MesoCoat shares from Powdermet and 120,710 MesoCoat shares from MesoCoat. As a part of the transaction, MesoCoat also executed a promissory note to Powdermet for $198,167.85 ("2014 MesoCoat/Powdermet Transaction").

28. This transaction resulted in Abakan transitioning from approximately 52.5% interest in MesoCoat to an 87.5% interest (90.95% interest including indirect ownership through Powdermet). Concurrently, Abakan had decreased its ownership position in Powdermet to 19.5% from 40.5%.

29. According to MesoCoat's press release ("Press Release"), the price Abakan paid for MesoCoat's shares was at a 58% premium to the last price that Abakan had converted already-invested capital to equity. This assertion was misleading and an inaccurate description of value. *See* Press Release attached as Exhibit D to the Complaint.

30. Individual Defendants did not conduct an independent evaluation of the value of MesoCoat before expending substantial assets in increasing its already-majority equity share. In its public disclosures, Individual Defendants stated that an independent business valuation would be conducted on or before August 31, 2014, but no such business valuation was ever conducted. Upon information and belief, the only valuation ever conducted was by an unqualified forensic accountant that was not completed until <u>after</u> the transaction was closed.

31. The basis for valuing MesoCoat was an aggressive discounted cash value, and the basis for valuing Powdermet was merely a book value. This form of valuation made MesoCoat misleadingly look much more valuable as compared to Powdermet. Thus, even the retroactive justification for undertaking this expensive transaction was flawed, and did not provide a basis for consummating the transaction at the prices involved.

32. Upon information and belief, the above-summarized stock exchange agreement was not an arms-length transaction.

33. Upon information and belief, Individual Defendants did not have sufficient information, and did not seek sufficient information, upon which to determine whether an additional

7

investment in MesoCoat was worthwhile, or whether Abakan was receiving adequate value for its substantial investment.

34.    Upon information and belief, by not disclosing all of the relevant facts, not conducting the necessary research, and manipulating relevant valuations, Individual Defendants caused Abakan to pay an inflated price for the MesoCoat shares acquired in the 2014 MesoCoat/Powdermet Transaction - a breach of their duties of care, candor, and loyalty to the Company.

**B. Abakan's Officers and Directors Purposefully Failed to Pay The Company's Debts on Several Occasions to Advance Their Own Financial Interests**

35.    On or about October 25, 2010, Sonoro acquired 1,660,000 restricted shares of Abakan in a private placement.  On or about December 29, 2010, Sonoro acquired 490,000 common shares of Abakan, with a value date of January 3, 2011.  Sonoro has never sold any of its shares.

36.    Abakan was also indebted to Sonoro by and through an Amended Convertible Promissory Note in the principal amount of $1,500,000 issued on March 17, 2011, a second Amended Convertible Promissory Note in the principal amount of $200,000 issued on June 7, 2011, and a Promissory Note in the principal amount of $405,000 issued on April 23, 2013 (collectively, the "Promissory Notes").  Ultimately, Abakan defaulted on these Promissory Notes; and, upon information and belief, the default ensued because Individual Defendants were transferring available funds from the Company to advance their own personal interests.  The breach of these Promissory Notes led to a separate enforcement action in federal court, in the Southern District of Florida, at Civ. No. 14-23640 ("Florida Litigation").

37.    On May 15, 2015, Abakan and Sonoro reached a settlement in the Florida Litigation. Under the terms of the settlement, the Promissory Notes were replaced with a single Senior Convertible Promissory Note, in the principal amount of $2,915,000, bearing an interest rate of 5%, with a maturity date of February 29, 2016 ("Sonoro Note").  However, Abakan soon defaulted on this note as well.

. . .

. . .

. . .

38.     As a result of Abakan's reckless disregard for its obligations under the Sonoro Note and its subsequent default, Sonoro initiated arbitration proceedings on July 27, 2015. On October 2, 2015, the arbitrator granted Sonoro a consent award in the amount of $3,215,000, plus interest and taxable costs.

39.     Sonoro moved to confirm the consent award in the United States District Court of the Southern District of Florida, Civ No. 15-23691.  Final entry of judgment and confirmation of the award was granted by the court on October 7, 2015, further contributing to the Company's financial obligations.

40.     The Individual Defendants also failed to make timely Securities and Exchange Commission ("SEC") filings.  Abakan was required to file a 10-Q on April 14, 2015.  Instead it filed a request for an extension, stating that it would file the 10-Q in five days and that it required time to complete its consolidated financial statement.  It made no such filing until May 4, 2015. This unexcused failure to timely file SEC required reports was a violation of a covenant in a secured note with another creditor, George Town Associates S.A. ("George Town Note"), for a principal amount of $1,341,963.34.   This violation was a breach of the George Town Note and, along with other breaches, led to a default.

41.     The maturity date of the George Town Note was April 27, 2015.  Abakan did not pay down its obligation when it was due and remains in default of this obligation as well.

42.     As a result of the Company's default, on May 4, 2015, George Town brought six claims against Abakan in the Southern District of New York, Civ. No. 15-3435 (DLC) ("New York Litigation").  The New York Litigation sought *inter alia*: (i) recovery on the George Town Note based on the defaults that occurred when Abakan failed to file a timely Form 10-Q and/or repay George Town; (ii) recovery from MesoCoat on a Guaranty agreement; (iii) a determination that plaintiff is entitled to exercise its remedies under § 7 of a Security Agreement, which would allow George Town to take possession of MesoCoat's assets; (iv) injunctive relief; and (v) appointment of a receiver.

43.     On May 6, 2015, Judge Cote issued a temporary restraining order restricting Abakan and MesoCoat from, *inter alia*, paying or declaring any dividend or distribution, repurchasing or

9

otherwise acquiring any of its stock, incurring any indebtedness, or selling, leasing, or otherwise disposing any portion of significant assets "outside of its ordinary business without George Town's consent." *See* Temporary Restraining Order against Abakan and MesoCoat, dated May 6, 2015, attached as Exhibit E to the Complaint.  On May 22, 2015, the May 6 temporary restraining order was converted into a preliminary injunction.

44.     Notwithstanding this Preliminary Injunction, on July 27, 2015, barely a month after its issuance by the court, Abakan breached its terms, and the material covenants in Article II of the Sonoro Note and the George Town Note, by increasing its ownership in subsidiary, MesoCoat Inc. to 100%, in exchange for 20.5% of Abakan's minority ownership in Powdermet. Abakan acquired from Powdermet the remaining 11.9% of MesoCoat along with land and equipment worth $550,000, the extinguishment of existing inter-company debt of $486,000, the return of 400,000 outstanding Abakan shares to authorized capital, and $1,000,000 in cash ("2015 MesoCoat/Powdermet Transaction").

45.     On July 28, 2015, in response to Abakan's breach of the Preliminary Injunction, George Town filed a motion for contempt and for the appointment of a receiver.  On August 14, 2015, the court found Abakan to be in civil contempt for violating the terms of the Preliminary Injunction, violations which were caused by Individual Defendants, and on August 18, 2015, appointed a Receiver over MesoCoat.  A copy of this order is attached as Exhibit F to the Complaint.

46.     On August 18, 2015, George Town was awarded summary judgment in the New York Litigation after the court found that Abakan was in default of the George Town Note and the Security Agreement, and MesoCoat was in violation of the Guaranty.  Upon information and belief, it was the lack of oversight by Individual Defendants, and their failure to act in conformity with their duty of care with respect to the George Town Note, that ultimately led to Abakan's default.[2]

47.     Ultimately, Abakan's failure to pay on its notes to George Town, Sonoro, and its other creditors was due to mismanagement, neglect, and/or the unlawful waste of Abakan's assets by and

---

[2] By incurring all of these debts and defaulting due to non-payment, Individual Defendants overwhelmingly increased Abakan's corporate liability.  By way of example, the George Town Note for $1,341,963.34 was increased by the Court, in its final judgment, to $1,770,932.03 because of Abakan's default.

through the acts and omissions of the Individual Defendants.  Upon information and belief, by authorizing Abakan to participate in the 2014 MesoCoat/Powdermet Transaction, Individual Directors unlawfully diverted funds that would otherwise have been used to pay down these notes for their own personal interests.  It was this mismanagement and waste that led to the appointment of the Receiver and eventually to the Company's bankruptcy.

**C.  Other Forms of Neglect Have Substantially Injured Abakan**

48.     Individual Defendants used their positions of control to authorize a leasing arrangement between Abakan's subsidiary, MesoCoat, and its affiliate Powdermet, and Sherman Properties LLP, a related-party (a company incorporated by Sherman and in which he has an economic interest). MesoCoat maintains 22,000 square feet of research and development space and an 11,000 square foot clad pipe manufacturing facility located at 24112 Rockwell Drive, Euclid, Ohio, each of which is leased from Powdermet on a sub-lease basis that runs through May 31, 2020. The cost of the sub-lease for MesoCoat, per month, is $6,700, the full sum of which is directly paid to Powdermet.  Powdermet maintains 48,000 square feet of research and development space located at the same address - 24112 Rockwell Drive, Euclid, Ohio.  The cost of the lease is $6,800 per month, adjustable on an annual basis, paid to Sherman Properties LLP. The term of the lease runs through October 31, 2020, with the right to sub-lease the premises to MesoCoat.  Sherman serves as the CEO of Powdermet and is on Abakan's Board, making this a related-party transaction.  The leases for both MesoCoat and Powdermet are for exceedingly long terms and above-market rates for the designated office space.  Upon information and belief, this transaction was conducted to benefit Individual Defendants at Abakan's expense.

49.     On November 11, 2014, Abakan also entered into a share subscription agreement with UP Scientech Materials Corp. ("UP Scientech"), pursuant to which UP Scientech  purchased 7,500,000 voting common restricted shares of Abakan at a price of $0.40 per share for an aggregate purchase price of $3,000,000 ("UP Transaction").  The Company publicly stated that it would use the proceeds from the UP Transaction to pay off MesoCoat's general and administrative expenses, taxes, and utilities.  However, upon information and belief, Individual Defendants instead imprudently utilized the proceeds to disproportionately pay down personal related-party debts.  At

the time, Individual Defendants were fully aware that Abakan was in default upon its notes, and that diverting these funds from the Company would drive it into further debt.

50.     Abakan's CFO, Costas Takkas, who, until recently, was responsible for signing Abakan's SEC filings, has been charged with corruption related to his engagement as former general secretary of the Cayman Islands Football Association by the U.S. Department of Justice.  Takkas was arrested by Swiss authorities and extradition to the United States is pending.   His appointment as CFO by Abakan's Board exhibits a failure of oversight and exercise of judgment by the Board.   As a result of this failure, Takkas was improperly appointed and placed in a position to, and did, harm Abakan.

**D.  Demand for Investigation and Review**

51.     On June 25, 2015, in response to Individual Defendants' wrongful behavior, Sonoro made a Demand on Abakan's Board asking it to investigate the claims asserted herein and to pursue legal action to enforce the Company's legal rights.   Specifically, Abakan's officers and directors were asked to: (i) undertake (or cause to be undertaken) an independent internal investigation into the violations of Nevada and/or federal law by each member of Management; (ii) commence a civil action against Individual Defendant to recover the damages sustained by Abakan, if alleged violations are found true, as a result of their breaches of fiduciary duties and violations of Nevada and/or federal law alleged herein; and (iii) immediately hold the required annual stockholder's meeting or a special meeting so that directors could be duly elected.

**E.  Violations and Breaches Since Issuance of the Demand**

52.     Upon issuance of the Demand, Individual Defendants took various steps to evade the requested actions, demonstrating a conscious disregard for their duties and a blatant violation of the Demand.  Abakan's Board failed to deliver on each and every request in the Demand.

53.     Because of the extremely high premium paid for MesoCoat's shares, the transfers made in Paragraphs 27 and 44 *supra* were made without Abakan receiving a reasonably equivalent value in exchange for the transfers.  Upon information and belief, Raymond Tellini, an independent member of Abakan's Board, ultimately resigned from the Board due to Individual Defendants' improper activities, including, but not limited to, the 2014 and 2015 MesoCoat/Powdermet

Transactions.  *See* Raymond Tellini's letter of resignation ("Resignation Letter"), attached hereto as Exhibit G to the Complaint.

54.     Upon information and belief, Abakan refused to provide Raymond Tellini, the head of its Audit Committee, a member of the Compensation Committee, the Nominating & Governance Committee, the Compliance & Ethics Committee, and an independent member of Abakan's Board, with the valuations and relevant documents necessary to make an informed decision regarding the 2015 MesoCoat/Powdermet Transaction, prior to the vote by the Board.

55.     On September 15, 2015 Abakan filed a 10-K revealing for the first time that it had issued various convertible debt securities in excess of $500,000, and issued over 260,000 shares of its common stock to pay other creditors and as a bonus to an employee – yet another blatant violation of the Preliminary Injunction.[3]  *See* Exhibit E to the Complaint.  Thereafter, on September 24, 2015, Judge Cote found that Abakan had again violated the terms of her preliminary injunction and appointed a Receiver over Abakan itself.  *See* Exhibit A to the Complaint.

56.     In its Form 10-K/A filed on September 17, 2015, Abakan disclosed a $65,000 related-party loan payment, which, upon information and belief, Individual Defendants caused Abakan to

---

[3] Paragraphs 5(c) and 5(d) of the Preliminary Injunction prohibit Abakan from:

> c) Incurring any indebtedness, or otherwise assuming, guaranteeing, endorsing, contingently agreeing to purchase or otherwise becoming liable for the indebtedness of any other person, firm, partnership, joint venture or corporation, or grant or suffer to exist any lien on its assets, except only with respect to indebtedness expressly referenced in the Note, indebtedness to trade creditors or financial institutions incurred in the ordinary course of business and consistent with past practice, or borrowings for which the proceeds shall be used to repay George Town's Note;

> d) Issuing any equity securities of Defendants, or any securities that are convertible, exercisable or exchangeable into equity securities of Defendants, except shares of common stock that are issuable (a) under any employee equity incentive plans in effort prior to the date of the Note, or (b) upon the exercise of conversion of securities that were outstanding prior to the date of the Note, provided that in each such case, issuances are made in accordance with the terms of the underlying plan or securities documents as in effect prior to the date of the Note and not pursuant to terms that have been amended after the date of this Note…"

*See* Exhibit E to the Complaint.

make in breach of their fiduciary duties, as such capital should have been put towards paying down the Company's overwhelming debt.

57.     Upon information and belief, on or about September 16, 2015, Miller, with Goss' assistance, signed and submitted correspondence instructing Powdermet to divert the sum of $61,000 to an account in Abakan's name at Fifth Third Bank in Euclid, Ohio (the "Fifth Third Bank Account") for the purpose of frustrating George Town's judgment.  The following day, a check in the amount of $61,000 was deposited in the Fifth Third Bank Account.

58.     On or about September 21, 2015, Goss caused the following transfers to be made by Abakan from the Fifth Third Bank Account:  (i) a $10,000 check was made to CFO Consultants, a company owned by Abakan's CFO, David Charbonneau, (ii) a $28,000 wire transfer was made to Goss, and (iii) a $22,000 cashier's check was paid to Chase Bank to satisfy credit card debt (collectively, the "Abakan Transfer").  These payments were made for the personal benefit of the Individual Defendants and constituted a breach of the Individual Defendants' duties to the Company.

59.     On October 28, 2015, in the Court of Common Pleas, Cuyahoga County, Ohio, Goss was sued for fraudulent conveyance of funds in connection with the activities briefly described in Paragraphs 57 and 58 *supra*.  Goss caused the transfers set forth in the preceding paragraphs to be made by Abakan with an actual intent to hinder, delay, and defraud, and without providing Abakan with a reasonably equivalent value in exchange for the transfer or obligation.  Upon information and belief, at the time of the fraudulent transfers, Abakan was insolvent and unable to pay off several of its debts to its creditors.

## COUNT ONE
### (Breach of Fiduciary Duty- Against Individual Defendants)

60.     Sonoro hereby repeats and realleges paragraphs 1 through 59 above as if fully set forth herein.

61.     The Individual Defendants violated their fiduciary duties to the Company by engaging in activities designed to reduce and/or eliminate the value of the Company for the benefit of their own personal and financial interests.  Such violations include: taking value for their own profit,

exploiting various opportunities that belonged to the Company, and extending loans to evade creditors and retain the funds for their personal benefit.

62.    As directors and officers of Abakan, the Individual Defendants owed fiduciary duties to the Company, including a duty of loyalty that required the Individual Defendants to elevate the interests of the Company above their own personal and financial interests.

63.    By authorizing Abakan to enter into all of the inequitable transactions and dealings set forth above, Individual Defendants' prioritized their personal interests over those of the Company and breached their duty of loyalty.

64.    Individual Defendant breached this duty of loyalty by entering into the UP Scientech Transaction and diverting funds that were intended to go toward paying off MesoCoat's expenses, and instead used the proceeds to pay down their own related-party debts.

65.    Individual Defendants also breached their duty of loyalty by obligating Abakan, on behalf of MesoCoat and Powdermet, to enter into inequitable lease agreements with related-party Sherman Properties LLP.  Individual Defendants prioritized their own financial interests over those of the Company.

66.    As Abakan's officers and directors, Individual Defendants, also had an obligation to act upon an informed basis.  They were required to review all relevant, material information and act with the requisite care in making business decisions.

67.    Individual Defendants failed to exercise due care in satisfying their obligations under the Promissory Notes, the Sonoro Note and the George Town Note, causing Abakan to needlessly default on its obligations.

68.    Individual Defendants were also in breach of their duty of due care to the Company when they failed to conduct a proper valuation of the 2014 and 2015 MesoCoat/Powdermet Transactions.  Abakan was forced to pay an extremely high premium for MesoCoat's shares without receiving reasonably equivalent value in exchange for the transfer.

69.    Additionally, Individual Defendants failed to exercise due care with regard to compliance with SEC requirements for timely disclosures.

. . .

70.     As directors and officers of Abakan, Individual Defendants also had a duty of candor and were obligated to disclose all material facts concerning Abakan to other directors and officers and to the shareholders.

71.     In violation of this duty of candor, Individual Defendants withheld, suppressed and/or misrepresented significant material information pertaining to Abakan, including, but not limited to, significant and irreconcilable conflicts of interests of certain directors and officers, as well as the role these conflicted directors and officers took in concealing and/or manipulating material financial information, including information pertaining to acquisitions, trades and related-party transactions, and known or obvious acts of self-dealing by one or more of the other officers and directors.

72.     Individual Defendants were in breach of their duty of candor to Abakan when they failed to disclose their personal interests in the 2014 and 2015 MesoCoat/Powdermet Transactions.

73.     The acts of the Individual Defendants set forth above constitute a breach of their fiduciary duties as directors and officers, the breach of which involved intentional misconduct, fraud, and a knowing violation of the law. As a result of the intentional misconduct and breach of its duties alleged herein, the Individual Defendants are in violation of Nev. Rev. Stat. § 78.138(7) and are liable to the Company.

74.     Since none of the related-party transactions set forth above fall under the exceptions provided for in Nev. Rev. Stat. § 78.140, warranting protection from a void or voidable related-party transaction, the agreements and transactions entered into by the Individual Defendants, were interested party transactions, and therefore are null and void.

75.     Ultimately, by engaging in these acts, the Individual Defendants breached their fiduciary duties to Abakan, and are liable to the Company for damages.

**COUNT TWO**
**(Unjust Enrichment - Against Individual Defendants)**

76.     Sonoro hereby repeats and realleges paragraphs 1 through 75 above as if fully set forth herein.

77.     By their actions alleged herein, Individual Defendants received certain valuable rights and benefits to which they were not entitled.

16

78.     By entering into the UP Scientech Transaction, Individual Defendants diverted funds that were intended to go toward paying off MesoCoat's expenses, and instead used the proceeds, to which they were not entitled, to disproportionately pay down their own related-party debts.

79.     Under the leasing arrangement with Sherman Properties LLP, Abakan is obligated, through MesoCoat and Powdermet, to pay above-market rates for excessively long terms.  This leasing arrangement originated for Individual Defendants' personal gain as the requisite lease payments go directly to a related-party entity.

80.     Individual Defendants' enrichment is directly and casually related to the Company's decline and detriment.  Ultimately, Individual Defendants personally profited by engaging in the wrongful conduct set forth above, at Abakan's expense.

81.     Individual Defendants knowingly and willingly accepted the benefits conferred upon them.  The facts and circumstances of this case are such that it would be unfair, unjust, and unconscionable to permit the Individual Defendants, by and through their interests in their other companies, to retain the benefits conferred upon them.

### COUNT THREE
### (Gross Mismanagement - Against Individual Defendants)

82.     Sonoro hereby repeats and realleges paragraphs 1 through 81 above as if fully set forth herein.

83.     By their actions alleged herein, the Individual Defendants abandoned and abdicated their responsibilities and fiduciary duties with regards to prudently managing Abakan's assets and business in a manner consistent with the operations of a publicly held corporation.

84.     Individual Defendants each had a duty to Abakan and its shareholders to prudently supervise, manage, and control Abakan's operations.

85.     Individual Defendants grossly mismanaged their fiduciary duties by failing to comply with the timely disclosures required by the SEC.

86.     Individual Defendants also engaged in gross mismanagement by failing to satisfy their obligations under the Promissory Notes, the Sonoro Note, and the George Town Note, causing Abakan to needlessly default, in an effort to advance their own personal interests.

17

87.     By breaching the Preliminary Injunction, Individual Defendants put their personal interests before the interests of the Company and in doing so, grossly mismanaged Abakan's resources.

88.     Additionally, Individual Defendants grossly mismanaged Abakan by allowing the unauthorized conveyance of funds from the Company to related parties, as was the case with the Abakan Transfer.

89.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breach of duty alleged herein, Abakan has sustained and will continue to sustain significant damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays the Court order and adjudge the following relief in favor of Sonoro, and against Individual Defendants:

A.      Recoupment, disgorgement, or other return of funds to Abakan that were wrongfully diverted from Abakan's legitimate business enterprises;

B.      Monetary damages for Abakan;

C.      Punitive damages for Abakan;

D.      Costs, disbursements, and attorneys' fees for Sonoro; and

E.      Any further and additional relief the Court deems just, proper, and equitable.

. . .

. . .

. . .

### JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated: December 3, 2015

By: _/s/ Scott D. Fleming_

Craig Weiner, Esq.
(*pro hac vice* to be submitted)
Richard Mescon, Esq.
(*pro hac vice* to be submitted)
Sherli Furst, Esq.
(*pro hac vice* to be submitted)
Robins Kaplan LLP
601 Lexington Avenue, Suite 3400
New York, New York 10022-4611
Telephone:  (212) 980-7400
Facsimile:  (212) 980-7499
CWeiner@RobinsKaplan.com
RMescon@RobinsKaplan.com
SFurst@RobinsKaplan.com

James Patrick Shea, Esq.
Scott D. Fleming, Esq.
Armstrong Teasdale LLP
3770 Howard Hughes Parkway, Suite 200
Las Vegas, NV 89169
Main: (702) 678-5070
Direct: (702) 473-7079
Cellular: (702) 743-6263
Jshea@ArmstrongTeasdale.com
SFleming@ArmstrongTeasdale.com

*Attorneys for Plaintiff, Sonoro Invest S.A.*

**VERIFICATION**

In accordance with Fed. R. Civ. P. 23.1(b), and pursuant to 28 U.S.C. § 1746(1), I,

_Anton Wyss_ verify under penalty of perjury under the laws of the United

States of America that I am the _Director_ of SONORO INVEST, S.A., the Plaintiff in

the above-entitled action. I have reviewed  the facts set forth in the foregoing Verified

Shareholder Derivative Complaint and confirm that same are true and correct to be the best of

my knowledge, except as to those matters stated upon information and belief, which I believe

to be true.

DATED: December 2, 2015

20

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



GEORGE TOWN ASSOCIATES S.A.,

              Plaintiff,

v.

ABAKAN, INC. and MESOCOAT, INC.,

              Defendants.

Case No. 15-cv-3435 (DLC)

## [PROPOSED] ORDER

Plaintiff, George Town Associates S.A. ("George Town") filed a Complaint on May 4, 2015, seeking damages and equitable relief.  On June 18, the plaintiff moved for summary judgment and to dismiss the defendants' counterclaim.  On July 28, the plaintiff moved for an order finding Abakan, Inc. ("Abakan") and MesoCoat, Inc. ("MesoCoat") in contempt and for the appointment of receiver over MesoCoat.  Following a hearing on August 14, 2015, Robert Seiden was appointed as Receiver over MesoCoat.  On August 18, the plaintiff's June 18 motion for summary judgment was granted.  On September 17, the plaintiff moved for an order finding Abakan in contempt and for the appointment of receiver over Abakan.  Following a hearing on September 24, Robert Seiden was appointed as Receiver over Abakan.

The Court has considered the pleadings, declarations, exhibits, and memoranda filed by the parties and the record at the evidentiary hearing held on September 24, and finds that:

1.      This Court has jurisdiction over the subject matter of this case and all parties thereto;

2.      There is good cause to believe that absent the relief requested herein, George Town will suffer irreparable injury;

3.      Abakan defaulted on the secured promissory note at issue in this action and summary judgment was entered in George Town's favor on August 18, 2015.  Weighing the equities, considering George Town's success on the merits, and for the reasons stated on the record on September 24;

4.      Robert Seiden ("Receiver") is hereby appointed as receiver over Abakan's business and business assets with the responsibilities and powers stated below:

    a)  Holding cash and payment obligations in trust for George Town;

    b)  Taking possession of the collateral and, for that purpose, entering, with the aid and assistance of any person, any premises where the collateral is or may be placed and remove the same;

    c)  Exercising discretion in all voting and consensual rights of Abakan, receiving cash dividends, interest, and other payments on the collateral, and exercising all rights with respect to the collateral as if it were the sole and absolute owner thereof;

    d)  Operating Abakan's business using the collateral and to assign, sell, lease, or otherwise dispose of all or any part of the collateral, without demand upon or notice to Abakan;

    e)  Notifying Abakan's account debtors and obligors to make payments directly to George Town, and enforcing Abakan's rights against such account debtors and obligors;

    f)  Directing any financial intermediary or any other entity holding any investment property to transfer the same to George Town;

    g)  Transferring all intellectual property registered in Abakan's name with the U.S. Patent and Trademark Office (or the U.S. Copyright Office) into George Town's name;

    h)  Disposing of the collateral; and

    i)  Using, licensing, or sublicensing any intellectual property owned by Abakan.

5.      In furtherance of his duties and responsibilities, the Receiver shall have the full power of an equity receiver over Abakan, its agents, representatives, officers, employees and affiliates, and over all of the funds, assets, accounts, properties, premises, claims, books and

records of Abakan, whether owned by Abakan in whole or in part, or directly or indirectly, including but not limited to the power and authority to:

    a) Operate and administer the business of Abakan subject to further order of this Court, with full authority to perform all acts necessary or incidental thereto, including the making of such payments and disbursements as may be necessary and advisable for the preservation of the businesses; and

    b) Exercise all other powers, rights and authority customarily exercised by an equity receiver.

    6.    Abakan and its officers, directors, agents, servants, employees, successors, assigns, subsidiaries, affiliates, corporations, and other persons or entities under the control of any of them, or under common control with them, shall fully cooperate with and assist the Receiver, including by answering all questions concerning Abakan, and shall take no action, directly or indirectly, to hinder, obstruct or interfere with the Receiver or his retained professionals or their agents in the conduct of their duties.

    7.    The Receiver shall have the exclusive power to file, proceed and operate in and under, any case under Title 11 of the United States Code, by placing Abakan voluntarily in a case under any applicable Chapter of said Title, and to operate the businesses thereof as debtor-in-possession or trustee, in which case he shall at all times be subject to and governed by all provisions thereof and of all statutes, rules and administrative requirements related thereto, including without limitation, the rules and guidelines pertaining to compensation and reimbursement of expenses.

    8.    The Receiver is hereby vested with, and he is authorized, directed and empowered to exercise, all of the powers of Abakan's officers, directors, partners, employees, representatives, or persons who exercise similar powers and perform similar duties; and Abakan, and each of them, and their officers, partners, agents, employees, representatives, directors,

successors in interest, attorneys in fact and all persons acting in concert or participating with

them, are hereby divested of, restrained, enjoined and barred from exercising any of the powers

vested herein in the Receiver.

IT IS FURTHER ORDERED that any and all actions taken by the Receiver pursuant to

this Order shall be effectuated in a manner which is consistent with *both* federal and state laws as are

applicable to a receiver.  The Receiver's liability, if any, shall be consistent with his role as a

fiduciary.

IT IS FURTHER ORDERED that the Receiver shall *must* provide statements of account not

less than every 30 days to the parties in this action.

IT IS FURTHER ORDERED that, prior to either assigning, disposing of, transferring, or

hypothecating any collateral belonging to Abakan with a value of in excess of $50,000.00, the

Receiver shall first give 7 days prior notice to the parties in this action

SO ORDERED:

Dated:        New York, New York
              September 24, 2015

                                                              *1/15 am.*

                                              _____
                                                      DENISE COTE

                                              United States District Judge

9.  The Receiver shall have access to the Books and Records
    of Abakan and/or Mesocoat in possession of the U.S. Marshal,
    Southern District of Florida, giving simultaneous notice to
    all Counsel.                                              *dlc*

4

# EXHIBIT B

Sonoro Invest S.A.
Calle 53E
Urbanizacion Marbella
MMG Tower
Piso 16
Panama City, Panama

June 25, 2015

*U.S. Mail*

Abakan, Inc.,
c/o Robert Miller
2665 S. Bayshore Drive
Suite 450
Miami, FL 33133

Re:   Sonoro Invest, SA

Dear Mr. Miller:

Sonoro Invest, SA, a Panamanian corporation is both a shareholder and creditor to Abakan, Inc. ("Abakan"). Sonoro purchased common shares of Abakan on June 8, 2011 and retains such ownership through today. Pursuant to Federal Rule of Civil Procedure 23.1(b)(3) and comparable State procedural requirements, we write on behalf of Sonoro and those similarly situated to demand that Abakan's Board of Directors (the "Board") take action to remedy breaches of fiduciary duties, violations of law (including errors, misstatements, misleading statements, acts, omissions, neglect, and/or breaches of duties in official capacities) by certain current and/or former directors and executive officers of Abakan, including Robert Miller, Costas Takkas, Stephen Goss, and Andrew Sherman. Collectively, the foregoing executive officers and directors of the Company will be referred to herein as "Management."

As you are aware, by reason of their positions as officers and directors of Abakan and because of their ability to control the business and corporate affairs of Abakan, Management owed and owes Abakan and its shareholders the fiduciary obligations of good faith, loyalty, and due care, and are required to use their utmost ability to control and manage Abakan in a fair, just, honest, and equitable manner. Sonoro believes that Management has violated these core fiduciary duty principles, causing Abakan to suffer damages. In particular, Management has caused Abakan to face significant challenges by failing to properly manage its corporate affairs, failing to hold required stockholder meetings, failing to make required SEC filings, wasting corporate assets, failing to disclose related party transactions, and failing to investigate proposed business transactions in accordance with their duties of care and other obligations.

JUNE 25, 2015                            U.S. MAIL
PAGE 2

 

Based upon the events described herein, Sonoro demands that the Board: (i) undertake (or cause to be undertaken) an independent internal investigation into the violations of Nevada and/or Federal law by each member of Management; (ii) commence a civil action against each member of Management to recover for the benefit to Abakan the amount of damages sustained by Abakan as a result of their breaches of fiduciary duties and violations of Nevada and/or federal law alleged herein; (iii) immediately hold the required annual stockholder's meeting or a special meeting so that directors can be duly elected.

### A. The Board of Directors has failed to call an annual stockholders meeting for at least four years.

Under Nevada Revised Statutes § 78.330, directors of every corporation must be elected at the annual meeting of stockholders by a plurality of the votes cast at the election. According to the Bylaws, "Directors shall be elected at the Annual Meeting of the stockholders of [Abakan]. . . ." (Bylaws, Art. IV, Sec. 1.) The Board has the authority to set the time, date, and place for the annual meeting – but the Bylaws of Abakan require that it take place within 120 days after the end of the prior fiscal year. (Bylaws, Art. III Sec. 2.) The last fiscal year ended May 31, 2014. Therefore, the stockholder meeting was required to occur on or before September 28, 2014. Thus, as of the writing of this demand, the annual meeting for 2014 was over seven months overdue.

Under Nevada law, "[i]f any corporation fails to elect directors within 18 months after the last election of directors required by NRS 78.330, the district court has jurisdiction in equity, upon application of any one or more stockholders holding stock entitling them to exercise at least 15 percent of the voting power, to order the election of directors in the manner required by NRS 78.330." NRS 78.345. Here, Abakan has failed to have an election of directors within the last 18 months. Indeed, as far as Sonoro can discover, Abakan has *never* elected directors pursuant to state law and in accordance with its own Bylaws.

As a result, Sonoro demands that the Board of Directors calls either the long-overdue annual meeting or a special meeting in order to address the business of Abakan, including the election of directors.

75612867.1

JUNE 25, 2015                              U.S. MAIL
PAGE 3

---

**B. Management has approved transactions without sufficient investigation or information, and Abakan has been harmed as a result.**

On or about May 31, 2014, Abakan converted $6,200,000 of its investment in MesoCoat to equity. It also gave 310,000 Powdermet shares and 2,000,000 of Abakan restricted stock common shares to Powdermet. In exchange, it received 98,000 MesoCoat shares from Powdermet and 120,710 MesoCoat shares from MesoCoat. As a part of the transaction, MesoCoat also executed a promissory note to Powdermet for $198,167.85. This transaction resulted in Abakan transitioning from approximately 52.5% interest in MesoCoat to an 87.5% interest (90.95% interest including indirect ownership through Powdermet). Abakan simultaneously decreased its ownership position in Powdermet to 19.5% from 40.5% as a result of this transaction.

According to MesoCoat's press release, the price Abakan paid for MesoCoat's shares was a 58% premium to the last price that Abakan converted already-invested capital to equity. Abakan did not conduct an independent evaluation of the value of MesoCoat before expending substantial assets in increasing its already-majority equity share. Abakan stated in public disclosures that an independent business valuation would be conducted on or before August 31, 2014, but no such business valuation was conducted. Upon information and belief, the only business valuation ever conducted was by a forensic accountant unqualified to conduct a business valuation. In addition, the basis for valuing MesoCoat was an aggressive discounted cash value, and the basis for valuing Powdermet was merely a book value. These mismatched forms of valuation made Mesocoat look more valuable as compared to Powdermet. Thus, even the retroactive justification for undertaking this expensive transaction was flawed, and does not provide a basis for consummating the transaction at the prices involved.

Because of the extremely high premium paid for MesoCoat's shares, such transfer was made without Abakan receiving a reasonably equivalent value in exchange for the transfer. As a result of this related-party transaction, Abakan suffered a loss to its net resources and its ability to meet its other financial obligations. Because of the lack of investigation, Management violated their duties of care. Sonoro demands that the Board perform an independent investigation into failure to take due care, acts of self-dealing, fraud, or other violations of fiduciary duties and Nevada/federal law with respect to this transaction, and/or any other transactions with related parties.

75612867.1

JUNE 25, 2015                              U.S. MAIL
PAGE 4

---

C.  **Management has engaged in self-dealing acts, and Abakan has been harmed as a result.**

According to public filings, Abakan received notice of a non-public fact finding inquiry from the Securities and Exchange Commission on November 21, 2014, with a formal order to produce certain documentation. The Commission seeks to determine whether there have been any violations of federal securities laws. The Commission has subpoenaed Abakan regarding potential undisclosed related-party transactions concerning Investor Relations firms and potential kickbacks paid by Mr. Miller to a Wells Fargo broker.

As a result, Sonoro demands that the Board perform an independent investigation into acts of self-dealing, fraud, or other violations of fiduciary duties and Nevada/federal law with respect to this transaction, or any other transactions with related parties.

D.  **Management has failed to apply proceeds of a private placement as represented to lenders and shareholders, and has instead paid the proceeds to pay off related party loans.**

Abakan initiated a private placement of up to eighteen million seven hundred and fifty thousand (18,750,000) shares of its restricted common stock, at a price of $0.40 a share. According to public disclosures, Abakan undertook this transaction:

> to realize and extinguish debt of up to seven million five hundred thousand dollars ($7,500,000), to support ongoing operations, retire outstanding debt and bolster product development. The placement has realized $427,800 in cash proceeds as of the filing date of this report and subsequent to the filing date of this report, is expected to include the extinguishment of debt in the amount of $764,000, in proceeds realized since the annual period end, and an additional $1,700,000 in proceeds realized prior to the annual period end. The Company has further allocated $4 to $5 million dollars of the private placement to secure an industry partner, which expectation, if realized, will occur subsequent to the filing date of this report. The

JUNE 25, 2015                                     U.S. MAIL
PAGE 5

_____

Company does not intend to close this private
placement prior to realizing the aforementioned
expectations.

In a transaction document with UP Scientech that was also publicly
disclosed, Abakan and its subsidiary MesoCoat stated that proceeds from the UP
Scientech transaction would be used to pay MesoCoat general and administrative
expense, taxes, and utilities, PComp capex and consumables, meet the Cermaclad
budget, meet MesoCoat's accounts payable, including to related subsidiary
Powdermet, "Alberta," and Abakan general and administrative expenses and
accounts payable.

Management failed to apply the proceeds from the private placement
transaction as it disclosed. Instead, it utilized the proceeds to disproportionately
pay down related-party debts at the expense of Abakan and its other creditors. As
a result, Abakan has been forced to defend several lawsuits, including one
asserted by Sonoro, seeking repayment on defaulted Notes. Sonoro demands that
the Board perform an independent investigation into acts of self-dealing, fraud, or
other violations of fiduciary duties and Nevada/federal law with respect to this
transaction, and/or any other transactions with related parties.

### E.  Abakan has suffered from gross mismanagement and waste.

Akaban has also suffered because of Management's failure to make timely
SEC filings.  Akaban was required to file a 10-Q on April 14, 2015. Instead it filed
an extension, stating that it would file the 10-Q in five days and that it required
time to complete its consolidated financial statement. It made no such filing until
May 5, 2015. This unexcused failure to timely file SEC required reports was one of
the reasons it fell into default on a Note for a principal amount of $1,341,963.34 to
George Town Associates S.A., a Note that required compliance with such SEC
requirements.

Akaban has also suffered because of Management's failure to make
required payments of its financial obligations. Akaban has failed to pay its notes to
creditors George Town, Sonoro and to Joe T. Eberhard. Failure to pay these notes
is due to mismanagement, neglect, or the unlawful divestiture of Akaban's assets
by and through its offers and directors.

75612867.1

JUNE 25, 2015                           U.S. MAIL
PAGE 6

---

### F.  The Board wasted assets by hiring Investor Relations firms.

Mr. Miller and the Board have wasted corporate assets by retaining multiple IR firms at the same time. These acts incurred in unnecessary fees, and an IR firm investment that is overly inflated for a business of Abakan's size. As a result, Sonoro demands that the Board perform an independent investigation into acts of self-dealing, fraud, or other violations of fiduciary duties and Nevada/federal law with respect to this transaction, or any other transactions with related parties.

### G.  Costas Takkas unlawfully abused his position with FIFA.

In addition to the above, Abakan's CFO, who is responsible for signing Abakan's SEC filings, has been charged with corruption related to his engagement as former general secretary of the Cayman Islands Football Association by the US Department of Justice. His appointment as CFO by the board violates fiduciary duties, including the duty of care, by the Board because it constitutes further evidence of a failure of oversight and exercise of judgment by the Board. As a result of this failure of care and oversight, Mr. Takkas was improperly appointed and was placed in a position to harm Abakan and its shareholders. As a result, Sonoro demands that the Board perform an independent investigation into acts of self-dealing, fraud, or other violations of fiduciary duties and Nevada/federal law with respect to his appointment and/or his actions while in office.

In summary, Sonoro demands that the Board perform an independent investigation into acts of self-dealing, fraud, waste, or other violations of fiduciary duties, duties of care, and Nevada/federal law with respect to these transactions. An independent attorney should be appointed in connection with this investigation. If within a reasonable period of time, not to exceed thirty days after receipt of this letter, the Board has not commenced an action and taken the other measures as demanded herein, Sonoro will commence a shareholder's derivative action on behalf of the Company seeking appropriate relief.

75612867.1

JUNE 25, 2015                                      U.S. MAIL
PAGE 7

Sonoro reserves the right to add additional claims as they are uncovered during its ongoing investigation.

Sincerely,

Sonoro Invest S.A.

**Anton Wyss**

LAA/bmk

cc:   Kevin Chen
      Stephen Goss
      Ryan Owen
      Andrew Sherman
      Raymond Tellini

75612867.1

# EXHIBIT C



**ORDERED in the Southern District of Florida on December 1, 2015.**

A. Jay Cristol, Judge
United States Bankruptcy Court

---

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA

In re:                                      Case No. 15-29606-BKC-AJC

ABAKAN, INC.,                               Chapter 11

      Alleged Debtor.
_____/

In re:                                      Case No. 15-29607-BKC-AJC

MESOCOAT, INC.,                             Chapter 11

      Alleged Debtor.
_____/

**ORDER DETERMINING (A) THE AUTOMATIC STAY PURSUANT TO 11
U.S.C. § 362(a) IS INAPPLICABLE DURING THE GAP PERIOD BETWEEN
THE FILING OF AN INVOLUNTARY PETITION UNDER 11 U.S.C. § 303 AND
AN ORDER FOR RELIEF UNDER 11 U.S.C. § 303(h); AND (B)
ALTERNATIVELY, THE AUTOMATIC STAY IS LIFTED IN CONNECTION
WITH THE PENDING ACTIONS BEFORE THE NY DISTRICT COURT AND
SECOND CIRCUIT COURT OF APPEALS**

THIS CAUSE came before the Court for hearing on November 19, 2015 upon the Motions of Petitioning Creditors for (i) Removal of Equity Receiver; (ii) Appointment of Interim Trustee Pursuant to 11 U.S.C. § 1104(a)(2); and (iii) Entry of an Order Directing the Receiver to Turnover the Alleged Debtor's Property to the Trustee [ECF No. 7 in Case No. 15-29607-BKC-AJC; ECF No. 5 in Case No. 15-29606-BKC-AJC] (the "Motions").   At the hearing, for the reasons stated on the record, the Court continued the Motions, pending a determination of whether an order for relief should and will be entered in this case. An evidentiary hearing to determine if relief will be ordered is set by separate order, and will be held on January 13, 2016.

In the interim, the Court ruled that the automatic stay pursuant to section 362(a) of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") is inapplicable during the gap period between the filing of an involuntary petition under section 303 of the Bankruptcy Code and an order for relief under section 303(h) of the Bankruptcy Code (the "Gap Period").  Accordingly, the United States District Court for the Southern District of New York, in Case No. 1:15-CV-3435-DLC, and the United States Court of Appeals for the Second Circuit, in Case No. 15-2906, may proceed in all matters pending, or which will be pending, before them concerning Abakan, Inc. and/or MesoCoat, Inc., until such time as an order for relief is entered in these involuntary cases.

The Court is informed that U.S. District Judge Denise L. Cote has reset for hearing the approval of that certain transaction [to extinguish debt of Abakan, Inc. and/or MesoCoat, Inc. in exchange for assets] proposed by the equity receiver, and the Court looks forward to Judge Cote's decision with respect to approval of that transaction.  This Court appreciates the patience of U.S. District Judge Denise L. Cote and determination in

2

concluding this matter. The Court is aware of the reputation of Judge Cote and has full confidence in her ability to appropriately deal with the related issue pending before her.

   If it should be determined that this Court is incorrect and the automatic stay applies during the Gap Period, the automatic stay is lifted during the Gap Period pursuant to section 362(d) of the Bankruptcy Code with respect to all actions and proceedings in connection with or related to Abakan, Inc. and MesoCoat, Inc., pending before the United States District Court for the Southern District of New York, and any related matters pending before the United States Court of Appeals for the Second Circuit. If relief is ordered in this case after the January 13, 2016 evidentiary hearing, the automatic stay shall apply, or be reimposed, as the case may be.

   As a result of the Court's foregoing determination(s), the Secured Judgement Creditors' Motion for Order (i) Dismissing Involuntary Petition Pursuant to Section 305 of the Bankruptcy Code, or, in the Alternative, (ii) for Stay Relief [ECF No. 22 in Case No. 15-29607-BKC-AJC; ECF No. 20 in Case No. 15-29606-BKC-AJC] as amended [ECF No. 27 in Case No. 15-29607-BKC-AJC; ECF No. 21 in Case No. 15-29606-BKC-AJC] and the (b) Receiver's Motion for Entry of An Order Clarifying or Declaring that the Automatic Stay does not Apply [ECF No. 23 in Case No. 15-29607-BKC-AJC; ECF No. 22 in Case No. 15-29606-BKC-AJC] are denied in part, as moot, without prejudice to the motions being renewed at or after the January 13, 2016 evidentiary hearing on the involuntary petitions.

   IT IS SO ORDERED.

###

Linda Leali, Esq. is directed to mail a copy of this Order to all interested parties immediately upon receipt of this Order and shall filed a certificate of service with the Clerk of the Court.

3



**ORDERED in the Southern District of Florida on December 1, 2015.**

_A. Jay Cristol, Judge_
**A. Jay Cristol, Judge**
**United States Bankruptcy Court**

---

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA

In re:                                    Case No. 15-29606-BKC-AJC

ABAKAN, INC.,                             Chapter 11

     Alleged Debtor.
_____/

In re:                                    Case No. 15-29607-BKC-AJC

MESOCOAT, INC.,                           Chapter 11

     Alleged Debtor.
_____/

**ORDER DETERMINING (A) THE AUTOMATIC STAY PURSUANT TO 11
U.S.C. § 362(a) IS INAPPLICABLE DURING THE GAP PERIOD BETWEEN
THE FILING OF AN INVOLUNTARY PETITION UNDER 11 U.S.C. § 303 AND
AN ORDER FOR RELIEF UNDER 11 U.S.C. § 303(h); AND (B)
ALTERNATIVELY, THE AUTOMATIC STAY IS LIFTED IN CONNECTION
WITH THE PENDING ACTIONS BEFORE THE NY DISTRICT COURT AND
SECOND CIRCUIT COURT OF APPEALS**

THIS CAUSE came before the Court for hearing on November 19, 2015 upon the Motions of Petitioning Creditors for (i) Removal of Equity Receiver; (ii) Appointment of Interim Trustee Pursuant to 11 U.S.C. § 1104(a)(2); and (iii) Entry of an Order Directing the Receiver to Turnover the Alleged Debtor's Property to the Trustee [ECF No. 7 in Case No. 15-29607-BKC-AJC; ECF No. 5 in Case No. 15-29606-BKC-AJC] (the "Motions").   At the hearing, for the reasons stated on the record, the Court continued the Motions, pending a determination of whether an order for relief should and will be entered in this case. An evidentiary hearing to determine if relief will be ordered is set by separate order, and will be held on January 13, 2016.

In the interim, the Court ruled that the automatic stay pursuant to section 362(a) of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") is inapplicable during the gap period between the filing of an involuntary petition under section 303 of the Bankruptcy Code and an order for relief under section 303(h) of the Bankruptcy Code (the "Gap Period").   Accordingly, the United States District Court for the Southern District of New York, in Case No. 1:15-CV-3435-DLC, and the United States Court of Appeals for the Second Circuit, in Case No. 15-2906, may proceed in all matters pending, or which will be pending, before them concerning Abakan, Inc. and/or MesoCoat, Inc., until such time as an order for relief is entered in these involuntary cases.

The Court is informed that U.S. District Judge Denise L. Cote has reset for hearing the approval of that certain transaction [to extinguish debt of Abakan, Inc. and/or MesoCoat, Inc. in exchange for assets] proposed by the equity receiver, and the Court looks forward to Judge Cote's decision with respect to approval of that transaction.   This Court appreciates the patience of U.S. District Judge Denise L. Cote and determination in

concluding this matter. The Court is aware of the reputation of Judge Cote and has full confidence in her ability to appropriately deal with the related issue pending before her.

If it should be determined that this Court is incorrect and the automatic stay applies during the Gap Period, the automatic stay is lifted during the Gap Period pursuant to section 362(d) of the Bankruptcy Code with respect to all actions and proceedings in connection with or related to Abakan, Inc. and MesoCoat, Inc., pending before the United States District Court for the Southern District of New York, and any related matters pending before the United States Court of Appeals for the Second Circuit. If relief is ordered in this case after the January 13, 2016 evidentiary hearing, the automatic stay shall apply, or be reimposed, as the case may be.

As a result of the Court's foregoing determination(s), the Secured Judgement Creditors' Motion for Order (i) Dismissing Involuntary Petition Pursuant to Section 305 of the Bankruptcy Code, or, in the Alternative, (ii) for Stay Relief [ECF No. 22 in Case No. 15-29607-BKC-AJC; ECF No. 20 in Case No. 15-29606-BKC-AJC] as amended [ECF No. 27 in Case No. 15-29607-BKC-AJC; ECF No. 21 in Case No. 15-29606-BKC-AJC] and the (b) Receiver's Motion for Entry of An Order Clarifying or Declaring that the Automatic Stay does not Apply [ECF No. 23 in Case No. 15-29607-BKC-AJC; ECF No. 22 in Case No. 15-29606-BKC-AJC] are denied in part, as moot, without prejudice to the motions being renewed at or after the January 13, 2016 evidentiary hearing on the involuntary petitions.

IT IS SO ORDERED.

### 

Linda Leali, Esq. is directed to mail a copy of this Order to all interested parties immediately upon receipt of this Order and shall filed a certificate of service with the Clerk of the Court.

# EXHIBIT D



In-house thermal spray coating
services using our long-life
PComP™ nanocomposite coatings.
**Submit a Request for Quote now!**

Home     About Us     Solutions     Applications     Quality & HSE     R & D     Testimonials     Media     Careers     Contact Us

# Press Releases

## Abakan Increases Direct Ownership in MesoCoat to 87.5% through Conversion of Investment and Partial Exchange of Powdermet Interest

June 02, 2014

MIAMI (GLOBE NEWS WIRE) – Abakan Inc. (OTCQB: ABKI) ("Abakan") an emerging leader in the advanced coatings and metal formulations markets, today announced that it has increased its ownership position in its majority owned subsidiary, MesoCoat Inc. ("MesoCoat"), to a 87.5% direct and 89.9% direct and indirect ownership. The increase is the result of: a) Abakan converting an additional $6,200,000 that it has invested in MesoCoat to equity; b) Abakan exchanging 21.0% of its 40.5% ownership in Powdermet for 65.3% of Powdermet's shares of MesoCoat; and c) by issuing 2,000,000 restricted shares of Abakan to Powdermet, Abakan intends to acquire those remaining shares of MesoCoat held by Powdermet in exchange for those remaining shares of Powdermet which it holds and the issuance of additional shares of Abakan, to the extent necessary, on receipt of independent business valuations of MesoCoat and Powdermet on or before August 31, 2014.

The price per share of the latest conversion of Abakan's investment in MesoCoat is at a 58% premium to the last price that Abakan converted invested capital to equity.

Abakan's commitment to providing lowest total cost of ownership, long life wear and corrosion solutions, led by its CermaClad™ and PComP™ product platforms, is clearly demonstrated by its decision to focus on near term commercial applications ahead of diverse contract R&D activities.

Mr. Robert Miller, Abakan's CEO, announced that Abakan director, Stephen Goss, will replace Andrew Sherman as CEO of MesoCoat effective immediately. Mr. Goss brings operational discipline and commercial focus, in a shift away from the technology development focus to commercial expansion, which transition will continue to be supported by Mr. Sherman.

Mr. Goss stated "Getting our important products to market is the focus of our immediate efforts at MesoCoat. Our products are necessary to meet the ever expanding demand for downtime reducing cladding and coating materials in connection with corrosion and wear protection for oil and gas activities, mining concerns, metal processing, and eventually infrastructure applications. With our renewed focus on manufacturing scale-up, cost reduction, and quality control, we believe that our disruptive CermaClad™ products will be ready for market in the near term, joining our PComP™ product family that has been accepted in the market and where demand currently outstrips our ability to supply. Our decision to focus on MesoCoat in connection with today's announcement will strengthen our overall operations,, which when combined with our world-leading technology should deliver significant results."

This decision to divest our ownership of Powdermet, as disclosed in a February 10, 2014, 8K disclosure, was mutually agreed upon by the Boards of Abakan, MesoCoat and Powdermet, and is an acceleration of the staged acquisition planned on Abakan's initial investment in 2009. The significant downturn in Powdermet's traditional aerospace and defense contracting business, and the need to reinvigorate Powdermet's technology platforms, in order to diversify its client base into new industries in the post-government-sequestration environment caused all parties to rethink their respective timelines. A mutual agreement was reached that Mr. Sherman, the founder, CEO, and technology leader of both MesoCoat and Powdermet was no longer in a position to dedicate the time and effort needed to effectively manage both the commercial deployment of MesoCoat's technologies and Powdermet's transition. Mr. Sherman will remain in a technical role, while Mr. Goss will provide the focus and disciplined management needed for near term profitability and commercial success.

Mr. Sherman stated "I am very excited about MesoCoat's transition to becoming a major commercial provider, which is the realization of my long term vision "to bring the benefits of advanced materials to the world". I fully

## Media

News

Press Releases

NanoMatters Newsletter

Videos

Presentations

Brochures

Resources

Awards

## Latest News

**July 15, 2015**

**Press Release**

Abakan Secures Test Orders from Major Industry Leaders... more »

More News »

More Press Releases »

## Media

Join our Mailing List »

Download CermaClad™ Brochure »

Download PComP™ Brochure »

     Share

support Mr. Goss and believe he is exactly what the organization needs at this time.  We have an exceptional team, and I look forward to the continued advancement and expansion of MesoCoat's revolutionary nanocomposites and large area cladding product portfolios for years to come."

### About Abakan Inc.

Abakan develops, manufactures, and markets advanced nanocomposite materials, innovative fabricated metal products and highly engineered metal composites for applications in the oil and gas, petrochemical, mining, aerospace and defense, energy, infrastructure and processing industries. Abakan's technology portfolio currently includes high-speed, large-area metal cladding technology; long-life nanocomposite anti-corrosion and wear coating materials. Abakan's products have demonstrated longer life, higher productivity and extremely high strength-to-weight ratios compared to competing technologies. The Abakan group of companies has been honored by The Wall Street Journal as the #1 Manufacturing Innovation across the globe, by Pipeline Industries Guild as the Top Subsea Pipeline Technology, by Forbes as the #1 Most Promising Material Science Company in the United States, by American Metals Market with the Steel Excellence Award, by Inc. 500 as one of the Fastest Growing Manufacturing Company in the U.S., and has received numerous other trade, industry and technology awards including five R&D 100 Awards and a Technology Innovation Award from the National Institute of Standards and Technology. Over $50 million has been invested in product development and testing by federal agencies, national labs and our companies in order to deliver products that offer improved performance over the current state of art. Abakan has successfully introduced its metal coatings for metal asset protection and life extension in the oil and gas and mining industries, and is currently focusing on the scale-up and commercialization of its highly disruptive metal cladding products for the oil and gas, oil sands, and mining industries. Abakan currently operates from multiple locations in United States, and intends to expand global operations in North America, Asia and South America.

### Forward-Looking Statements

*A number of statements contained in this press release are forward-looking statements. These forward looking statements involve a number of risks and uncertainties including technological obsolescence, market acceptance of future products, competitive market conditions, and the sufficiency of capital resources. The actual results Abakan may achieve could differ materially from any forward-looking statements due to such risks and uncertainties. Abakan encourages the public to read the information provided here in conjunction with its most recent filings on Form 10-K,Form 10-Q and 8-K. Abakan's public filings may be viewed at www.sec.gov.*

**Abakan Inc.**
Robert Miller, Chief Executive Officer
Phone: 786-206-5368
Email: robert.miller@abakaninc.com
www.abakaninc.com

**Investor Relations**
Surety Financial Group, LLC
Phone: 410-833-0078
www.suretyfingroup.com

Home | Abouts Us | Cladding |  Coating        MesoCoat Inc.
Applications | Quality & HSE | Media | Careers        24112 Rockwell Drive, Euclid, OH, 44117-1252
Contact Us | Privacy |  © 2013 MesoCoat Inc.        Phone: 216.453.0866 - info@mesocoat.com



# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



GEORGE TOWN ASSOCIATES S.A.,

                              Plaintiff,

v.

ABAKAN, INC. and MESOCOAT, INC.,

                              Defendants.

Case No. 15-CV-3435 (DLC) (JLC)

## TEMPORARY RESTRAINING ORDER AND APPOINTMENT OF RECEIVER

Plaintiff, George Town Associates S.A. ("George Town") has filed a Complaint seeking damages and equitable relief ("Complaint"), and has moved, pursuant to Rules 65 and 66 of the Federal Rules of Civil Procedure, for a Temporary Restraining Order, Preliminary Injunction, and Appointment of Receiver ("George Town's Motion"), against Defendants, Abakan, Inc. ("Abakan") and MesoCoat, Inc. ("MesoCoat") (collectively, "Defendants").

## Findings

The Court has considered the pleadings, declarations, exhibits, and memorandum filed in support of George Town's Motion, Defendants' responses thereto, conducted an evidentiary hearing on the matter, and finds that:

1.    This Court has jurisdiction over the subject matter of this case and all parties thereto;

2.    There is good cause to believe that absent the relief requested herein, George Town will suffer irreparable injury;

1

3.      There is good cause to believe Abakan defaulted the secured promissory note at
issue in this action, and that George Town is therefore likely to prevail on the merits of this
action, and weighing the equities and considering George Town's likelihood of ultimate success
favors George Town's requested relief;

4.      It is in the public interest that the Court enter a Temporary Restraining Order;

5.      Therefore, the Court hereby restrains Defendants from performing any of the
following actions outside its ordinary business without George Town's consent, which will not
be unreasonably withheld, ~delayed or conditioned,~ as set forth in the secured promissory note between George Town and
Abakan, which MesoCoat guaranteed:

   a) Paying, declaring, or setting apart for such payment, any dividend or other
      distribution (whether in cash, property or other securities) on shares of capital
      stock other than dividends on shares solely in the form of additional shares;
      or, directly or indirectly or through any subsidiary, making any other payment
      or distribution in respect of its capital stock except for distributions pursuant to
      any shareholders' rights plan which is approved by a majority of disinterested
      directors;

   b) Repurchasing or otherwise acquiring (whether for cash or in exchange for
      property or other securities or otherwise) in any one transaction or series of
      related transactions any shares of Defendants' capital stock or any warrants,
      rights or options to purchase or acquire any such shares;

   c) Incurring any indebtedness, or otherwise assuming, guaranteeing, endorsing,
      contingently agreeing to purchase or otherwise becoming liable for the
      indebtedness of any other person, firm, partnership, joint venture or
      corporation, or grant or suffer to exist any lien on its assets, except only with
      respect to indebtedness expressly referenced in the Note, indebtedness to trade
      creditors or financial institutions incurred in the ordinary course of business
      and consistent with past practice, or borrowings for which the proceeds shall be
      used to repay George Town's Note;

   d) Issuing any equity securities of Defendants, or any securities that are
      convertible, exercisable or exchangeable into equity securities of Defendants,
      except shares of common stock that are issuable (a) under any employee equity
      incentive plans in effect prior to the date of the Note, or (b) upon the exercise or
      conversion of securities that were outstanding prior to the date of the Note,
      provided that in each such case, issuances are made in accordance with the terms
      of the underlying plan or securities documents as in effect prior to the date of

the Note and not pursuant to terms that have been amended after the date of this Note;

    e)  Selling, leasing or otherwise disposing of any significant portion of assets outside the ordinary course of business; and

    f)  Lending any additional money, giving any additional credit, or making any additional advances to any person, firm, joint venture or corporation, including, without limitation, Defendants' officers, directors, employees, subsidiaries and affiliates.

6.      No security or bond is required of George Town for issuance of a restraining order.

7.      For the same reasons, good cause exists for appointment of a receiver over MesoCoat with the following powers, as set forth in the security agreement between the parties:

    a)  Holding cash and payment obligations in trust for George Town;

    b)  Taking possession of the collateral and, for that purpose, entering, with the aid and assistance of any person, any premises where the collateral is or may be placed and remove the same;

    c)  Exercising discretion in all voting and consensual rights of MesoCoat, receiving cash dividends, interest, and other payments on the collateral, and exercising all rights with respect to the collateral as if it were the sole and absolute owner thereof;

    d)  Operating MesoCoat's business using the collateral and to assign, sell, lease, or otherwise dispose of all or any part of the collateral, without demand upon or notice to MesoCoat;

    e)  Notifying MesoCoat's account debtors and obligors to make payments directly to George Town, and enforcing MesoCoat's rights against such account debtors and obligors;

    f)  Directing any financial intermediary or any other entity holding any investment property to transfer the same to George Town;

    g)  Transferring all intellectual property registered in MesoCoat's name with the U.S. Patent and Trademark Office (or the U.S. Copyright Office) into George Town's name;

    h)  Disposing of the collateral; and

    i)  Using, licensing, or sublicensing any intellectual property owned by MesoCoat.

3

**IT IS, THEREFORE, HEREBY ORDERED** that Defendants, their officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, are hereby temporarily restrained from violating any of the restrictions provided herein.

**IT IS FURTHER ORDERED** that Robert W. Seiden is appointed as receiver of MesoCoat with all powers as provided herein, pending the resolution of this matter.

**SO ORDERED**, this _____ day of _____, 2015.

_____
UNITED STATES DISTRICT JUDGE

*Nothing in this Order shall prevent the defendants from taking steps on notice to plaintiff that are reasonably necessary to achieve complete repayment of the plaintiff.*

*Denise Cote*
*May 6, 2015*
*4:30 p.m.*

# EXHIBIT F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



9/24/2015

GEORGE TOWN ASSOCIATES S.A.,

      Plaintiff,

v.

ABAKAN, INC. and MESOCOAT, INC.,

      Defendants.

Case No. 15-cv-3435 (DLC)

## [PROPOSED] ORDER

  Plaintiff, George Town Associates S.A. ("George Town") filed a Complaint on May 4, 2015, seeking damages and equitable relief.  On June 18, the plaintiff moved for summary judgment and to dismiss the defendants' counterclaim.  On July 28, the plaintiff moved for an order finding Abakan, Inc. ("Abakan") and MesoCoat, Inc. ("MesoCoat") in contempt and for the appointment of receiver over MesoCoat.  Following a hearing on August 14, 2015, Robert Seiden was appointed as Receiver over MesoCoat.  On August 18, the plaintiff's June 18 motion for summary judgment was granted.  On September 17, the plaintiff moved for an order finding Abakan in contempt and for the appointment of receiver over Abakan.  Following a hearing on September 24, Robert Seiden was appointed as Receiver over Abakan.

  The Court has considered the pleadings, declarations, exhibits, and memoranda filed by the parties and the record at the ~~evidentiary~~ hearing held on September 24, and finds that:

  1.  This Court has jurisdiction over the subject matter of this case and all parties thereto;

  2.  There is good cause to believe that absent the relief requested herein, George Town will suffer irreparable injury;

1

3.    Abakan defaulted on the secured promissory note at issue in this action and summary judgment was entered in George Town's favor on August 18, 2015. Weighing the equities, considering George Town's success on the merits, and for the reasons stated on the record on September 24;

4.    Robert Seiden ("Receiver") is hereby appointed as receiver over Abakan's business and business assets with the responsibilities and powers stated below:

    a)  Holding cash and payment obligations in trust for George Town;

    b)  Taking possession of the collateral and, for that purpose, entering, with the aid and assistance of any person, any premises where the collateral is or may be placed and remove the same;

    c)  Exercising discretion in all voting and consensual rights of Abakan, receiving cash dividends, interest, and other payments on the collateral, and exercising all rights with respect to the collateral as if it were the sole and absolute owner thereof;

    d)  Operating Abakan's business using the collateral and to assign, sell, lease, or otherwise dispose of all or any part of the collateral, without demand upon or notice to Abakan;

    e)  Notifying Abakan's account debtors and obligors to make payments directly to George Town, and enforcing Abakan's rights against such account debtors and obligors;

    f)  Directing any financial intermediary or any other entity holding any investment property to transfer the same to George Town;

    g)  Transferring all intellectual property registered in Abakan's name with the U.S. Patent and Trademark Office (or the U.S. Copyright Office) into George Town's name;

    h)  Disposing of the collateral; and

    i)  Using, licensing, or sublicensing any intellectual property owned by Abakan.

5.    In furtherance of his duties and responsibilities, the Receiver shall have the full power of an equity receiver over Abakan, its agents, representatives, officers, employees and affiliates, and over all of the funds, assets, accounts, properties, premises, claims, books and

records of Abakan, whether owned by Abakan in whole or in part, or directly or indirectly, including but not limited to the power and authority to:

    a) Operate and administer the business of Abakan subject to further order of this Court, with full authority to perform all acts necessary or incidental thereto, including the making of such payments and disbursements as may be necessary and advisable for the preservation of the businesses; and

    b) Exercise all other powers, rights and authority customarily exercised by an equity receiver.

6.    Abakan and its officers, directors, agents, servants, employees, successors, assigns, subsidiaries, affiliates, corporations, and other persons or entities under the control of any of them, or under common control with them, shall fully cooperate with and assist the Receiver, including by answering all questions concerning Abakan, and shall take no action, directly or indirectly, to hinder, obstruct or interfere with the Receiver or his retained professionals or their agents in the conduct of their duties.

7.    The Receiver shall have the exclusive power to file, proceed and operate in and under, any case under Title 11 of the United States Code, by placing Abakan voluntarily in a case under any applicable Chapter of said Title, and to operate the businesses thereof as debtor-in-possession or trustee, in which case he shall at all times be subject to and governed by all provisions thereof and of all statutes, rules and administrative requirements related thereto, including without limitation, the rules and guidelines pertaining to compensation and reimbursement of expenses.

8.    The Receiver is hereby vested with, and he is authorized, directed and empowered to exercise, all of the powers of Abakan's officers, directors, partners, employees, representatives, or persons who exercise similar powers and perform similar duties; and Abakan, and each of them, and their officers, partners, agents, employees, representatives, directors,

successors in interest, attorneys in fact and all persons acting in concert or participating with

them, are hereby divested of, restrained, enjoined and barred from exercising any of the powers

vested herein in the Receiver,

IT IS FURTHER ORDERED that any and all actions taken by the Receiver pursuant to

this Order shall be effectuated in a manner which is consistent with both federal and state laws as are

applicable to a receiver.  The Receiver's liability, if any, shall be consistent with his role as a

fiduciary.

IT IS FURTHER ORDERED that the Receiver ~~shall~~ must provide statements of account not

less than every 30 days to the parties in this action.

IT IS FURTHER ORDERED that, prior to either assigning, disposing of, transferring, or

hypothecating any collateral belonging to Abakan with a value of in excess of $50,000.00, the

Receiver shall first give 7 days prior notice to the parties in this action

SO ORDERED:

Dated:      New York, New York
            September 24, 2015

            11:15 am.

                                          _____
                                          DENISE COTE
                                          United States District Judge

9. The Receiver shall have access to the Books and Records
of Abakan and/or Mesocoat in possession of the U.S. Marshal,
Southern District of Florida, giving simultaneous notice to
all counsel.

4

# EXHIBIT G

September 16, 2015

**VIA EMAIL**

Board of Directors
Abakan, Inc.
2665 S. Bayshore Drive, Suite 450
Miami, FL 33133

Dear Abakan Board:

I resign from the Board of Directors (the "Board") effective immediately. While I am
certainly resigning for "good reason", since I am not providing 60 days notice I
hereby waive any claim on unexercised stock options as well as several thousands of
dollars in unpaid travel expenses.

I have struggled to perform my responsibilities as a director these past six months
due to the unrelenting harassment from Robert Miller, the Abakan CEO ("Miller"). I
have witnessed the dramatic destruction of shareholder and enterprise value by
Miller. Once again I urge the Board to remove Miller immediately to salvage any
remaining enterprise value.

You have all witnessed the Miller incompetence and harassment culminating
yesterday in the release of the 10K with inadequate disclosures and in violation of
internal control policies. I informed the Board several times that, as Head of the
Audit Committee, I needed to be included during the audit review process. I also
shared these concerns with Abakan's new auditor, Allen Waddle of Maloney &
Novotny (the "Auditor"). Instead, I received an email 33 minutes ahead of a Board
meeting yesterday to approve the 10K, with a draft attached (to clarify I had never
been shown a draft 10K or any other supporting or interim documents or work
product despite repeated requests). Since I was in a meeting, I did not receive this
email until after 11:30AM, I was unable to participate in the call but still quickly
glanced at the document and notified the Board and Auditor of (a) inadequate
disclosures contained in the 10K and (b) that the Audit Committee had no time to
perform an adequate review. I have attached the Abakan Audit Committee Charter
that was flagrantly ignored by the Board and outside Auditors.

I refer each of you to Section 9 of the Abakan By Laws (I have attached this
document for your review – please also note the requirements on Annual Meetings
which I believe this Board views as a mere suggestion rather than a requirement
since no meeting has been held since I have been a Director), calling for 24 hours
notice before a Board Meeting. Let's review the advance notice I have received on
the past four Board Meetings:

| Meeting Scheduled | Notice Sent | Notice Provided |
|---|---|---|
| 9/15/15, 11:30AM | 9/15/15, 10:57AM | 33 minutes |
| 8/10/15, 9AM | 8/9/15, 5:05PM | 16 hours (overnight) |
| 7/22/15, 5PM | 7/22/15, 9:53AM | 7 hours |
| 7/7/15, 9AM | 7/6/15, 9:56PM | 11 hours (overnight) |

In addition to receiving deficient notice of Board meetings, I was not provided with appropriate underlying materials to review. In fact, on the July 7th Board call, Miller told me to "get a lawyer" if I wanted him to turn over copies of the new convertible debt documents that he had negotiated. Perhaps because the terms were so outrageous, he did not want them to see the light of day (Footnote 18 to the 10K filed yesterday discloses interest rates "up to 44%" and conversion at "between 60% to 100% of the lowest trading price for 20 prior trading days".

It was only after the July 7th Board meeting (approving the Abakan-Powdermet exchange) that Andrew Sherman sent me the valuation for Powdermet. The Board was asked to vote on this complex transaction involving a Company insider without the benefit of this key document or a Fairness Opinion.

On June 25th Sonoro Invest S.A. ("Sonoro") sent the Board a detailed letter demanding the Board take action to remedy breaches of fiduciary duties and violations of law by Abakan officers and directors. On July 22nd Ryan Owen was appointed the head of an independent committee to investigate these allegations (even though Mr. Owen is a paid consultant to Abakan) and an attorney was hired. Shortly thereafter the attorney resigned for non-payment.

I encourage you all to re-read the Abakan Code of Business Conduct & Ethics that I have attached. I attended all Board meetings overlapping 2.5 years of Jeff Webb's directorship and never heard his voice nor saw his face. He was indicted in May 2015 by the DOJ in the FIFA scandal. Costas Takkas (whom Miller represented to be his "best friend") served as the Company CFO from February 7, 2014 through May 29, 2015. He is also under indictment by the DOJ in the FIFA scandal. With an indicted CFO having served during fiscal year 2015, the Company still refused to allow the Audit Committee to perform its job.

Regrettably,

Raymond Tellini